Filed 8/17/21  In re Trinity W. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re TRINITY W. et al., Persons Coming Under the Juvenile Court Law. | |
| | D078630 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| | (Super. Ct. No. J520586A-C) |
| Plaintiff and Respondent, | |
| v. | |
| MICHELLE G. et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of San Diego County, Rohanee Zapanta, Judge.  Reversed with instructions.

Richard L. Knight, under appointment by the Court of Appeal, for Defendant and Appellant Michelle G.

Jill Smith, under appointment by the Court of Appeal, for Michael G.

Office of the County Counsel, Caitlin E. Rae, Chief Deputy County Counsel and Lisa M. Maldonado, Deputy County Counsel, for Respondent.

Michelle G. (mother) and Michael G. (father) are the parents of Michael Jr., who was born in 2015. Mother and father (sometimes collectively, the parents) separately appeal the juvenile court's jurisdictional finding that Michael Jr. is a person described by Welfare and Institutions Code[1] section 300, subdivision (b)(1) (300(b)(1)) due to domestic violence between them. Mother separately appeals the court's finding that her twins, Tristan W. and Trinity W.[2] —who were born in 2012 and are the half-siblings of Michael Jr. (sometimes collectively, the children)— are also dependents of the court pursuant to section 300(b)(1). Mother and father contend that there is insufficient evidence to support the court's finding that the children were, at the time of the contested jurisdiction/disposition hearing, at "substantial risk" of suffering "serious physical harm or illness" as a result of the parents' past or current domestic violence.

As we explain, we agree with the parents that there is not substantial evidence to support a finding that the children were at "substantial risk" of suffering "serious physical harm or illness" at the time of the contested hearing. (§ 300(b)(1).) We therefore reverse the court's jurisdictional order and remand with instructions to dismiss the section 300(b)(1) petitions filed by respondent San Diego County Health and Human Services Agency (the Agency).

FACTUAL AND PROCEDURAL BACKGROUND

*Section 300 Petitions*

On November 20, 2020, the Agency filed a section 300 petition for each of the children alleging the following:

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] Tristan and Trinity's biological father, Erick W., is deceased.

2

"FAILURE TO PROTECT — [Section] 300(b)[(1)]

"CHILD EXPOSED TO VIOLENT CONFRONTATIONS . . . .

"The child has suffered or there is a substantial risk that the child will suffer, serious physical harm or illness[] as a result of the failure or inability of his or her parent . . . to supervise or protect the child adequately.

"COUNT 01: On or about October 20, 2020 the child was exposed to a violent confrontation in the family home between the mother and [father] involving the use of physical force in that the mother and [father] yelled and screamed at one another, and the [father] pushed the mother onto the bed and pinned her arms behind her, causing her fingernail to break and bleed. The minor TRINITY came out to ask the mother and [father] what they were doing and the children were all crying when law enforcement responded and arrested the [father], who bailed out and returned to the family home. The mother and [father] have a history of domestic violence in the presence of the children, including incidents where the [father] has threatened to kill the mother and has prevented her from leaving the room, and the children report frequent arguing in the home. The mother has filed restraining orders against the [father] previously, but they have continued to reside together, and the mother and [father] have violated two Safety Plans, which places the child at substantial risk of serious physical harm."

*November 23, 2020 Detention Report*

The detention report summarized the October 20 incident between the parents. The report noted that the parents engaged in a "verbal and physical altercation" in the early morning hours of October 20. During the incident, father allegedly pushed mother onto the bed. Father reportedly next grabbed mother's arms from underneath her, resulting in one of her fingernails being broken, and then pushed her from behind. The children were asleep in the

3

family home at the time. Although they awakened and heard the parents arguing, they did not witness any physical altercation between them.

Mother called 911. When deputies arrived, they found the children on the couch, crying and afraid. As noted in the petitions, father was arrested for felony domestic violence and within hours, made bail and returned home. The following day, the Agency received a referral regarding the family.

An Agency social worker separately interviewed mother and father on October 30 and determined that the family would benefit from a safety plan. The October 30 safety plan, which expired by its own terms on November 6, 2020, provided that the parents would reside separately and have physical contact only for exchanges of the children; that father would come to the family home and care for the children Monday through Friday from 7:30 a.m. to 3:30 p.m.; that mother would leave the home when father was present; and that the parents would not engage in any further "verbal or physical altercations" in the presence of the children.

The detention report stated that the parents did not follow all of the requirements of the October 30 safety plan, leading to the creation of a second plan on November 6, 2020, in which mother agreed to have physical contact with father only for "child exchanges." According to the detention report, the parents also did not follow all of the requirements of this second plan; the maternal aunt called an Agency social worker on November 9 and stated that one of the children had reported that mother and father were arguing in the family home.

The parents also created their own safety plan, without Agency assistance. According to the detention report, the parents failed to follow their own plan. The detention report nonetheless concluded that since the November 9 "incident" when the parents had allegedly argued, they "seemed

4

to be able to have peaceful contact with one another for the exchange of the children, as there have been no further altercations stated."

The detention report noted that after the October 20 incident, mother voluntarily enrolled herself and the children in counseling, and obtained a temporary restraining order against father, which was served on him on November 19. The Agency expressed concern that mother took these steps only to "appease" the Agency because, prior to the Agency's involvement, the parents allegedly "had taken no steps to address their conflict."

The Agency noted that mother stated that the restraining order was necessary because she did not want the children around father's ex-wife, Juda G., whom mother did not trust. The Agency reported that mother had a history of not following through with "protective actions"; on three occasions in the past year, she had sought a restraining order against father but allegedly had failed to serve him.

In connection with domestic violence, the detention report noted that father "has been verbally and emotionally abusive towards [mother] throughout their marriage (5 years), but this is the first time it has become physical, signifying an escalation in domestic violence. The mother stated that, historically, the father has: threatened to kill her if she tries to deny him access to the children; grabbed her arm and told her that it 'only takes 11 pounds of pressure to strangle someone' (April 2020); told her 'this would be a good place to bury a body'; prevented her from leaving rooms, and punched holes in the wall while in her presence. When asked if she believes the father would follow through on his threats, the mother stated she feared the father is capable of it if he's 'pushed far enough.' "

Mother expressed that she also had experienced domestic violence in her two previous marriages and had endured physical abuse from her own

5

father.  The detention report thus concluded that mother "is a victim to a cycle of abuse.  The mother stated that she filed for multiple protective orders against her first husband and fled the relationship by taking her children and going to a shelter."

The detention report noted that mother had five children from her first marriage to Cyrus C.  Three of these children were adults.  An Agency social worker interviewed mother's adult children and Cyrus.  Those interviews were summarized in the detention report.

The children's half-sister Kattline C. reported that mother "has struggled with mental health issues for 'many years' "; that mother had attempted suicide two or three times in the past; and that, although mother was capable of taking care of the children's "physical needs, such as food and clothing," she was incapable of meeting the children's emotional needs, describing mother as " 'not very present mentally.' "

Kattline disclosed that mother was verbally abusive toward her and her siblings when they were young.  Kattline also disclosed that mother " 'blows things out of proportion and has made false accusations in the past.' When [an Agency social worker] asked for examples of this, Kattline stated her mother made a false accusation against her father, Cyrus C., claiming that Cyrus raped her.  Kattline stated that a judge found this to be false."

Kattline stated that neither she nor her siblings had much, if any, current communication with mother.  Kattline also stated that mother " 'isn't a bad mom,' but has never really been present for any of her children," adding that, "[step-father] Michael is a good father and husband."  The detention reported noted that Kattline had "no concerns for Michael's parenting ability . . . as she believes Michael 'would never hurt [her] mom.' "

6

The Agency social worker also interviewed Alexis, the oldest child of mother and Cyrus.  When asked whether she knew why the Agency was contacting her, Alexis stated, " 'Because she [i.e., mother] is pulling some stunt.' "  Asked to explain this comment, Alexis stated that mother has done this "many" times before.  "Alexis stated that when she was 12 years old, 'My mom decided she didn't want to be with my dad [Cyrus] anymore so she took all of us kids to an abuse shelter with her.'  Alexis stated that her mother then went back to her father for a few months, and then 'would do it all over again,' meaning she would leave [Cyrus] and take the children to an abuse shelter again."  Alexis denied that there had been any physical abuse between mother and Cyrus.

Alexis stated that mother " 'suffers from bipolar disorder' and claimed that several doctors have diagnosed her with it.  Alexis also stated that her mother has PTSD and depression."  Alexis believed that mother's mental health issues stemmed from "past abuse from [mother's] dad when [she] was little."

Alexis reported that she had recently gone to court in Wyoming to defend father against abuse claims by mother.  Alexis explained:  " 'She [i.e., mother] did this a couple months ago (claim father was abusing her) and I went to court and testified on behalf of my stepfather (Michael).'  Alexis stated she testified against her mother because she believed her mother was lying against Michael."  Alexis went on to say that mother can take care of the children's physical needs like food and clothing, but not of their "emotional needs."

Mother's adult daughter Samantha C. stated during her Agency interview that she rarely speaks to mother. Samantha also expressed concern about mother's mental health.

Samantha recalled an incident that took place in her presence between mother and father, summarized in the detention report as follows: "[M]other [was] on the phone with the police stating that Michael 'was threatening her at gunpoint,' even though Michael 'has never even had a gun registered in his name.'" According to Samantha, prior to this incident "Michael had just fallen off a roof" and thus was "'incapable' of being able to point a gun.'" Samantha reiterated to the social worker that she and father were in the room when mother was on the telephone with police, and commented that mother "comes up with these stories in her head, and convinces herself that they're true." Samantha described father as being a "really good dad" who spends "99 percent of the time" with the children. She noted that mother, at times, was "verbally abus[ive]" to father and then "turns it around and makes herself look like the victim."

During his Agency interview, Cyrus stated that mother left Wyoming and moved to Phoenix, Arizona about four years earlier; that their two minor children, Jackson C. (17 years old) and Kennedy C. (15), remained with him because they did not want to live with mother; and that out of their five children, only Kennedy "still tries to have a relationship" with mother. Cyrus denied that any domestic violence had occurred during his marriage to mother.

Like their adult daughters, Cyrus also expressed concern about mother's mental health, explaining that mother had been in a "mental hospital on a couple occasions," including less than a year earlier when she had spent about two or three weeks in a California hospital. Cyrus also had concerns about mother's ability to parent the children. However, he had no such concerns about father. Cyrus noted that all of his children "love Michael."

8

The detention report also summarized the October 30, 2020 in-person interviews of the children. Regarding the October 20 incident, Tristan reported, "Mom was yelling like always." He added that, "mother broke her nail in the screen door and his father 'helped her get her nail out.' Tristan said that his parents were 'fighting over a note' and his mother 'trapped herself on the balcony' and 'called the police for nothing.' " When asked how he knew all of this, Tristan responded that he "saw it all happen." Tristan told an Agency social worker that he was "[s]ad" when the police arrested father.

Tristan was asked during the interview whether this was the first time that he had spoken to police. He stated that he had talked to police when the family was living in Wyoming after father had spanked his sister Trinity "really hard," leaving "bruises" on her bottom. Tristan further stated that father had spanked Trinity because she had "stabbed [Tristan] in the head with a pen." Tristan was asked whether the parents fought on other occasions. He told the social worker that they "fight a lot" and on further questioning, explained that by "fight[ing]" he meant "[y]elling at each other."

Trinity also described the October 20 incident. She told an Agency social worker that she and her siblings were sleeping when they were awakened by "noises and yelling" from their parents' bedroom. Trinity could not remember what she saw after they went into the bedroom, but added, "My mom has married three guys and is about to divorce again . . . and they were all abusive." On further questioning, Trinity said that she knew that father and mother's ex-husbands were abusive because her "mom told [her] they were abusive."

Trinity stated that father was responsible for breaking mother's fingernail during the October 20 incident. Trinity added that "[the parents]

9

yell at each other all the time [and] they argue a lot" and that she worried "they're gonna break up and they did."

Trinity addressed the Wyoming spanking incident. She admitted stabbing her brother in the head, saying she did it because he "annoy[s]" her. Trinity said that father spanked her on the bottom "really hard a lot of times," which led to some bruising.

An Agency social worker also spoke to Michael Jr. about the October 20 incident. He initially stated that mother broke her own fingernail, but later in the interview said that mother had told him that it was father who had broken her fingernail. Michael Jr. disclosed that the parents "fight every day." On November 18, an Agency social worker followed up with Michael Jr. He reported that "things" between parents were "good," that they were no longer fighting and that when they were together, they "just usually talk."

The detention report summarized an Agency interview with father. Father admitted arguing with mother in the early morning hours on October 20, after he found a court document that he claimed mother had hidden from him. Father stated that when he confronted mother about the document, "things got loud," but repeatedly denied that the argument had turned physical. Father said that while they argued, mother felt that he was holding her down, so she called the police. He added that mother struggles with bipolar disorder that tends to make her feel "trapped."

According to father, during the argument, the children awakened. Father disclosed that he initially wanted to leave, as he had done in the past when the couple argued. Instead, father remained at home because the police were en route. Father admitted pushing mother from behind when she was trying to leave during the October 20 incident, explaining that he "was trying to get her out of the home without a key." He denied breaking

10

mother's fingernail, stating that it broke when she " 'ran into the screen door' after going on the porch to call 911." The detention report added, "[Father] believed this injury was very minimal and 'blown out of proportion' by the police." Father reported that he was surprised when police arrested him, because he had not had an opportunity to tell his side of the story.

The detention report noted that on November 16, father called the Agency and expressed concern that mother would leave the state with the children, which, according to father, she had done in the past. Two days later, father again called the Agency after he had seen a restraining order against him in mother's open briefcase. Father again communicated to the Agency his belief that he had done nothing wrong.

A more extensive summary of the Agency's interview with mother was also included in the detention report. Mother reported that the October 20 incident was the "first time" that father had "gotten physical" with her. According to mother, father was trying to grab a "paper that she was holding behind her back" and in so doing, pushed her onto the bed, where he again tried to grab the paper, causing her fingernail to break. Because father tried to push her out of the home, she called police. Mother denied that the children had witnessed the incident, although she admitted that they may have heard the parents arguing.

Mother reported that in the past, father has been " 'verbally and emotionally abusive' toward her," that there was a "power dynamic in the relationship," that father told her that she is the one "with all the problems" and that father needed "to feel like he has control and power over her."

Mother reported that her "issues" with father started in about April 2020 when father's adult children allegedly "trashed" the parents' Wyoming home. In response, mother wrote a letter to their landlord stating that

11

father's adult children were "unfit" to reside in the home once the family left for San Diego. The landlord in turn showed the letter to father, who became angry, changed his marital status on a social media account to "[s]ingle," and, according to mother, took off his wedding ring and "blam[ed] everything on [her]."

Mother stated that she had experienced domestic violence in all three of her marriages. Mother claimed that her first husband, Cyrus, was "physically abusive to her when they were married," requiring that she obtain three or four restraining orders against him over the course of their relationship. She also accused Cyrus of "alienating" their adult children from her.

Mother claimed that father "beat" Trinity when the family was residing in Wyoming. As a result, on July 9, 2020, mother obtained, ex parte, a temporary restraining order in Wyoming against father. After obtaining the restraining order, mother left Wyoming with the children and came to San Diego. According to mother, father "followed" the family to San Diego but stayed in the area for only a few hours to drop off his grandson before returning to Wyoming. Mother claimed that father had violated the Wyoming restraining by making contact with the children while in San Diego.

Mother next sought a restraining order against father in San Diego. Shortly thereafter, mother returned to Wyoming to attend a court hearing on the July 9 restraining order. According to mother, the Wyoming court dismissed the temporary restraining order for lack of evidence. Upon her return to San Diego, mother decided not to serve father with the restraining order that she had obtained from the California court. Father also returned to San Diego soon after and, with the Wyoming restraining order dismissed

and the California restraining order expiring for lack of service, resumed living in the family home, where he remained until the October 20 incident.

According to mother, father's name was on the lease for the family's San Diego home because mother had not qualified for the apartment on her own. Mother nonetheless claimed that she could financially support herself and the children.

Mother admitted that she has been diagnosed with "depression, anxiety, and PTSD because of past abuse and domestic violence." However, she did not disclose having bipolar disorder, as reported by father and other family members. She admitted that she needed father's help with the children because she was attending law school in San Diego.

On November 6, 2020, mother reported to the Agency that she and father had separated and that they were in the process of finalizing their divorce. Mother also reported that she was no longer concerned about having another "verbal or physical altercation" with father.

According to the detention report, mother understood that the Agency was concerned for the children's welfare because in the past, mother and father had reunited "without having anything set up that would provide safety for her or the children." Mother claimed that she used to work for the Wyoming Department of Family Services (Wyoming DFS) and therefore understood the Agency's concerns regarding her safety and the safety of the children.

The detention report included a November 18, 2020 follow-up interview with mother. She reported that she had obtained a temporary restraining order against father on November 13 that also protected Tristan and Trinity. During the follow-up interview, Mother expressed concern that father would take the children and flee to Mexico.

In its detention report, the Agency made a number of recommendations including that the court find that a prima facie showing had been made that the children were persons described by section 300(b)(1). The court adopted the recommendations of the Agency to detain Tristan and Trinity with mother, and Michael Jr. with both mother and father, on the condition that mother and father reside separately.

*December 17, 2020 Jurisdiction/Disposition Report*

In the jurisdiction/disposition report, the Agency recommended that the court make a true finding on the section 300(b)(1) petitions, declare the children dependents of the court, detain the children with the parents and order that the parents reside separately, and offer family maintenance services. The Agency noted that, at the time of the hearing, the children were spending half of their time with each parent, who were residing in separate households, and that, as a result of the December 3 hearing, mother had obtained a three-year restraining order against father.

The Agency's jurisdiction/disposition report included an updated December 14 interview with mother. She disagreed with certain allegations in the section 300(b)(1) petitions, including that the children were exposed to domestic violence during the October 20 incident and that they were at risk of suffering serious physical harm as a result. She further claimed that the children were afraid after the incident not because of anything that father had done, but because of the presence of the police and father's arrest.

Mother reported that there had been no additional issues with father since the October 20 incident, and that the "current restraining order is working." She reiterated to the Agency that the October 20 incident was the first time there had been a physical altercation between the couple, and that the children had not been at risk. Mother noted some of the steps that she

14

had taken to keep herself and the children safe, including obtaining the restraining order against father, changing her telephone number, and limiting communication with father to e-mails concerning the children and co-parenting.

Mother was asked about the family's strengths. She responded, "the children are 'great' and 'happy' " and that they "get along and enjoy fishing, hiking, and camping." Mother was also asked about the needs of the family. "The mother reported that Trinity and Tristan expressed that they wanted contact with [father]. [Mother] stated that she feels they need to continue to remain [in] contact [with father], as their biological father has passed, and [father] is a father figure to them."

Mother informed the Agency that she was participating in counseling and in a domestic violence support group. Although she had participated in domestic violence services in the past, mother stated that her current classes were more "in depth" and "unique," giving her more insight about healthy and unhealthy relationships. Although mother did not think that any of the children needed therapy, she nonetheless enrolled them in a "kids support group."

The Agency scheduled an interview with father on December 15 to discuss jurisdiction and disposition. However, as of the date of the December 17 report, that interview had not taken place because the Agency social worker had been unable to locate father's recreational vehicle at the site where he was living. Father called the social worker, who had left him a voicemail message, and offered to meet the social worker either at his home or at the Agency's office.

An Agency social worker also spoke with maternal aunt Adriana. She reported having no concerns about the children "as long as they stay apart

15

(referring to parents)." She added that the children "could benefit from therapeutic services as 'they have grown up with their parents arguing a lot.' "

The Agency's December 17 report also included updated interviews of the children. Trinity reported that "she likes spending time in both households, her mother[']s and [father's]." Tristan did not provide any additional statements regarding his parents or services. Michael Jr. reported that he "likes spending time in both households," but that father's home, while "nice," was "little."

The December 17 report noted that the Agency had submitted domestic violence and parenting education referrals for the parents. Although the parents had divorced, the Agency continued to believe that without court supervision, the parents "have the potential to resume their relationship despite the continued violence between them." The Agency remained concerned for the "safety and wellbeing of the children" as a result of the parents' alleged "long-standing history of and current domestic violence and violations of restraining orders."

The Agency's recommendations included asking the court to make a true finding regarding the allegations and to sustain the section 300(b)(1) petitions, to place Tristan and Trinity with mother, and Michael Jr. with both mother and father, to find that "conditions still exist which justify initial assumption of jurisdiction under . . . Section 300 and/or such conditions are likely to exist if supervision is withdrawn," and to continue providing the parents with family maintenance services.

*February 3, 2021 Addendum*

The Agency submitted this report in connection with the pretrial conference hearing. The report included both a telephone and an in-person

16

interview with father. During a December 16 telephone call with an Agency social worker, father once again denied that any "physical violence" had occurred during the October 20 incident or at any other time during the parents' marriage. Father instead described the October 20 incident as a "verbal confrontation" in which he was the victim.

Father reported that he has visitation with the children and typically takes them to the park to do their schoolwork. He stated that his only communication with mother is through e-mail and that he picks up and drops off the children outside mother's home to avoid any direct contact with mother. Father expressed that mother was a "good parent," but added that she "needs medication and 'she knows she needs it.' "

An Agency social worker also interviewed father on January 8, 2021. Father again denied that there was any domestic violence or physical altercation during the October 20 incident. Father reiterated that during the incident mother became "very upset, ran to the balcony, and knocked the door out causing her nail to break." According to father, before police arrived, the children were "crying by his legs and were latching on not wanting him to leave." The Agency noted that father had enrolled in a domestic violence offenders group that was scheduled to begin on January 25, 2021.

Father claimed that, despite the December 3 restraining order, mother had "contacted him and had conversations outside of the children." The social worker advised father not to reply to mother's messages or to continue a conversation with her regarding subject matters not involving the children, because such communications could potentially violate the restraining order.

An Agency social worker interviewed mother on January 26. Mother reported that the children had completed two sessions of a children's support group, and that she was participating in a domestic violence group. An

Agency social worker also spoke with mother on January 28. Mother confirmed that the parents were complying with the terms of the restraining order.

On January 29, an Agency social worker met with mother and created a visitation schedule for the children. Mother stated that she was "actively taking" her prescribed medication and having labs done every six weeks. Mother admitted that this was the "first time" she has taken her medication consistently. Mother further stated that she was still participating in weekly therapy and domestic violence groups, and that there had been no new incidents with father. The Agency's recommendations for the family in its February 3 addendum remained unchanged from those in its December 17 jurisdiction/disposition report.

*February 19, 2021 Addendum*

In this addendum, the Agency noted that father has been "minimally motivated" to participate in domestic violence services. He had not attended any groups or reached out to his service provider regarding his lack of attendance. Father claimed that it was difficult for him to participate in these services because of work and his inability to connect online.

An Agency social worker also spoke with mother's therapist. The therapist "denied having any worries or concerns with mother's ability to keep her and the children safe." The therapist reported that mother was actively participating in therapy, and had a safety plan and a support system in place.

The February 19 report also summarized a conversation between an Agency social worker and the group therapist of Tristan and Trinity. The therapist noted that both children were "engaged" in a 12-week group course.

This same report also summarized a February 18 telephone conversation with mother.

Mother stated that since their divorce, she and father had been getting along well, had not argued, and were having no problem with "visitation exchanges" of the children. Mother further stated that she was moving out of state by May 2021, that father was aware of her plan and was "supportive," that father had agreed to stay at his daughter's Wyoming home when he visited the children, and that the parents would continue to follow the safety plan, the "case plan contract of six months," and the terms of the December 3 restraining order.

In its assessment/evaluation in its February 19 addendum, the Agency noted that mother had a "long history of domestic violence," including in past marriages that had resulted in mother seeking multiple restraining orders. The report also noted that mother was "compliant with the Agency and is participating in [a] domestic violence group and individual therapy," that Tristan and Trinity were enrolled in a children's support group, and that Agency therefore "commends the mother for her hard work and motivation to live a life free from violence."

Nonetheless, the Agency continued to recommend that the parents receive family maintenance services in order to demonstrate "behavioral changes consistently and overtime [*sic*] to show everyone that they can maintain a stable home free from violence, and meet all the emotional and physical needs of the children."

*Jurisdiction/Disposition Hearing*

At the February 19 hearing, the juvenile court noted that it had reviewed the November 23, 2020 detention report, and the December 17, 2020 jurisdiction/disposition report, as amended by the February 3 and 19,

19

2021 addenda.  The parties had no objection to the admission of these reports, which the court received in evidence.

Mother's Testimony

Regarding the October 20 incident, mother testified:  "There was an argument.  I felt threatened.  There was some violence against me, and I called 911 to protect myself and my children, and now we're here."  Mother stated that a protective order had been issued against father on November 13, 2020, that the October 20 incident was the first time that father had physically injured her, and that he had previously grabbed her arm during an argument but had not harmed her. Mother said that the children did not see the "physical" altercation during the October 20 incident but that it was possible they had heard arguing.

Mother denied violating the October 30 and November 6, 2020 safety plans, stating that she and father were merely working out "some visitation scheduling issues" that in no way "put anybody in danger."  Mother also denied that father had been back in the family home for "extended periods of time" after the October 20 incident, noting that father's work schedule was "variable," which required "some changes" to visitation.  Mother added, "The only contact we have had is regarding the children."  She said that for the last month or two, father had agreed to exchange the children outside her front door.  According to mother, the parents made this arrangement to ensure that "all safety concerns are fully addressed."

Mother testified that the parents' divorce became final on November 16, 2020.  Mother further testified that both she and the children were in counseling and that she started counseling because she had a "history of being a victim of domestic violence" and decided that she did not "want to be one again."  Mother added that she was just finishing her

domestic violence class, that she has a strong support network, and believes that she had done everything necessary to keep her and the children safe.

Mother testified regarding the Wyoming court action. She sought a restraining order against father in July 2020 because father had spanked Trinity, causing bruising. Mother at the same time also filed for divorce, and, together with the children, left father and came to San Diego to attend law school. Mother testified that she is taking medication for depression and regularly checks in with her doctor.

Mother was questioned about whether there had been any "new incidents" since the October 20 altercation with father. She responded, "No, not at all. In fact, we have been, you know, since the relationship isn't part of the equation anymore, we have been getting along great. He's been doing great with parenting, I have been doing great with parenting. I'm doing a lot better with mental health. A lot of things. Not even a cross word or an argument. It's been great." Mother testified that she will continue to adhere to the safety plan, stating that the children "are the most important thing in [her] life." Mother said that she was "motivated to protect [the children] over everything else" and believed that she had demonstrated her commitment to herself and the children, noting that she had arranged for services "before there was even a case filed" by the Agency.

Father's Testimony

Father denied that any domestic violence had occurred on October 20. Instead, he testified that he and mother had a "heated argument" that did not require the involvement of either the police or the Agency. He added, "My wife has PTSD. She has had issues in the past with herself and her emotions, which stems from her childhood of being abused."

Father testified that the October 20 incident was the culmination of events that began while the family was living in Wyoming, after he had refused mother's request to change his social media account back to show that they were married. According to father, he had changed the marital status on his account because he believed that mother needed to improve her relationship with "all the kids." Mother responded by obtaining a restraining order, which was served on him while he was in a park with the children and his grandson.

Father further testified that he had to drive his grandson back to San Diego, where the grandson lived with father's son. According to father, mother's oldest daughter lent father her car and gave him some money to drive his grandson back to San Diego. Father made the long drive to San Diego, only to arrive at the family home and find mother's car parked in front of the home. Because of the no-contact requirement in the Wyoming restraining order, father testified that he was unaware that mother and the children also had returned to San Diego.

Because mother and the children were likely inside the family home, father went to the Chula Vista Police Department to inquire about the enforceability of the Wyoming restraining order in California. Although father was told that the restraining order was likely not enforceable in California, after dropping off his grandson, father drove back to Wyoming.

However, father testified that before returning to Wyoming, he drove back to the family home, where he briefly encountered Tristan and Trinity. Not knowing what to do because of the Wyoming restraining order, father testified that he gave the two some "hard cand[y]" and told them not to tell mother, because he wanted to avoid any "trouble." On follow-up questioning by the court, father reiterated that the Wyoming restraining order was

22

subsequently dismissed by a Wyoming court. When asked how he knew that the restraining order had been dismissed, father stated that he was present in court when the judge dismissed the case.

Regarding his current relationship with mother, father testified that since their divorce "it's actually working out better than it was before." Father added, "So you know, as of now, I am fine with the way everything is. I got the kids as much as I want, she has them whenever she wants, which is smooth and all for her and my business."

Father testified that he has been a licensed contractor in California since 2004, and that he was working on obtaining his "100-ton masters captain's license." He also told the court that even before the divorce, he took care of the children "most of the time," because the parents' plan was for mother to attend law school in San Diego and for him to work when not caring for the children. Father described mother's work and school "ethic" as "stellar" and "top notch," but claimed that they no longer could be in a romantic relationship because it was "too much of a rollercoaster" for him and the family.

Father added that since the divorce, he has the children "most of the time," which he explained was "[j]ust about every day." He said that when he is with the children, they are "active and doing stuff." At the end of the day, he drops them off at the curb in front of mother's home, where he also picks them up. Father expressed that the children are "well-adjusted" and "understand what's going on" between the parents. Father described his ongoing interaction with mother as "pleasant" and "nice." Father noted that he could tell that mother was taking her medication and that things between them have "probably worked out for the best" because in the past, he had

found it difficult to deal with mother's "depression," "anxiety," and "PTSD," which he said could come on at "any time."

Father complimented mother for having the children in counseling. He recognized that the Agency wanted the parents to have a "specific list of days and times" for visitation. However, in father's view, the family's current situation was "perfect" because it allowed the flexibility that the family needed as a result of the pandemic, and the children's and mother's school schedules.

Oral Argument and Court's Ruling

The juvenile court next heard oral argument from counsel. The Agency relied primarily on the October 20 incident in asking the court to make a true finding on the section 300(b)(1) petitions, arguing that the children remained "at a substantial risk of serious physical harm" as a result of the failure of the parents to adequately protect the children due to domestic violence.

The Agency argued that at the adjudication hearing, the parents appeared to minimize both the extent of domestic violence in the family home and the impact it had had on the children, noting that each parent appeared to blame the other for the domestic violence and each refused to take responsibility for his or her role to protect the children. The Agency noted that as far back as 2010, Wyoming DFS had some involvement with the family; and that in 2018, this agency, while expressing "concern" about mother, had offered the family "counseling services," which the family had "declined." The Agency thus argued that there was a "pattern" of this family "not wanting to be working with social services [and] . . . refusing help," which it explained was another reason why court intervention was needed to protect the children.

24

Tristan's counsel argued that the child felt "safe and protected" in the care of both mother and father, particularly since they had divorced. Tristan liked living with mother and spending time with father and did not feel a need for Agency involvement at this time. Counsel described Tristan as a "happy young guy" and noted that Tristan wanted the court to know that he wanted to move back to Wyoming. Counsel nonetheless submitted on the Agency's recommendations, noting that while the family appeared to be "on the right track with the appropriate services," the Agency's continued involvement would ensure family "stability."

Counsel for both Trinity and Michael Jr. informed the court that both children also expressed the desire to return to Wyoming to be closer to their siblings, but that otherwise, both were "doing well in the care of their parents and [did not] have any worries or concerns that they would like to share" with the court. Like counsel for Tristan, counsel for Trinity and Michael Jr. recommended that the court follow the Agency's recommendations in order to allow the parents to demonstrate over an "extended period of time" that the children would not be exposed to additional incidents of domestic violence.

Mother's counsel argued that there was a lack of evidence to show that the parents had violated the safety plans put in place by the Agency. Counsel stated that in the "very, very beginning of this case, [father] would occasionally come into the house briefly to get a bike" or something along those lines, but that his doing so was not the "kind of violation that we should hold against this family when deciding whether it is appropriate for the Court to intervene." Mother also noted that the maternal aunt's November 9 report to the Agency that the parents were arguing in the family home was inadmissible "double hearsay;" it was based on statements from one of the children, and thus could not provide a basis to support jurisdiction.

25

Regarding the Wyoming July 9 restraining order, mother argued that the order was short-term, merely giving her "temporary custody" of the children and providing that "visitation and support" would be "determined at the next hearing," which was set for five days after its issuance. Moreover, counsel noted that both parents had separately testified that the July 9 order had been dismissed for lack of evidence. As such, mother argued that there was no "active" restraining order against father at the time of the October 20 incident.

Counsel also argued that mother was not minimizing what happened on October 20, observing that she talked about being physically injured by father. Counsel noted that mother had voluntarily sought services, which she had almost completed, that her family was "very large" and diverse, and therefore, that the "vague" reference to mother having declined services offered by the Wyoming DFS regarding an incident not involving the parents could not provide a basis for the court to impose jurisdiction over the children.

Mother also emphasized that the court should dismiss the section 300(b)(1) petitions because, in deciding whether to take jurisdiction, the court was required "to look at the now," namely, whether there is a "current risk of harm" to the children. Although counsel recognized mother's history of becoming involved in domestic violence, counsel argued that mother had "testified credibly and honestly" about the counseling and classes that she was receiving, how she had gained insight into the "cycle of domestic violence" that she had experienced in the past, and how these services had taught her "to empower herself from domestic violence."

Mother's counsel added that the parents had expressed no desire to reunite. Their exchange of the children outside the family home was working

well, and the last incident between the parents had occurred approximately four months ago. As such, mother argued that there was no longer a need for the court to intervene.

Father's counsel also argued that the section 300(b)(1) petitions should be dismissed. Father argued that the Agency had failed to prove by a preponderance of the evidence that the allegations in the petitions were true. He argued that mother's version of events from the October 20 incident should be considered in light of the other evidence (summarized *ante*), including from mother's adult children, who told the Agency that in the past, mother had "made false allegations . . . of abuse" not only against father but also against her first husband Cyrus.

Counsel highlighted in particular Samantha's statements to the Agency about mother previously claiming that father was threatening mother at gunpoint, even though Samantha was present in the room as mother was making these statements and personally observed that father was neither holding a gun, nor could he have done so because of an arm injury. Father's counsel also argued that the statements from Tristan and Trinity did not support a finding that the October 20 incident involved physical violence between the parents.

Like mother, father also argued that the Agency had not shown by a preponderance of the evidence that there was a "current risk" to the children to support jurisdiction. Father's counsel described the October 20 incident as a "one-time," "very minor incident," and highlighted that since that incident, "there has been no other cause for concern" with respect to the family. Father's counsel also noted that the parents had divorced, had no desire to reunite, and therefore, the children were no longer at risk of harm, as also noted by their appointed counsel.

27

After hearing brief additional argument, the court found by a preponderance of the evidence that the Agency had satisfied its burden to show that the allegations in the section 300(b)(1) petitions were true. The court followed the Agency's recommendations, including placing Tristan and Trinity with mother and Michael Jr. with both parents, and ordered that maintenance services continue for the parents.

In making its ruling, the court found that the October 20 incident that involved "alleged violence" between the parents was the primary basis for the petitions. The court further found that on July 9, 2020, mother had sought a restraining order against father in a Wyoming court. The court was unwilling to "speculate" as to why mother had sought the July 9 restraining order, but found that "[s]omething happened in Wyoming"; and that since the October 20 incident, the parents had separated and divorced and there had been no other incidents between them. Based on the July 9 Wyoming restraining order, which the court stated it would use as a "baseline" for the children's alleged "exposure to violence and their sensitivity to violence" culminating in the October 20 incident, the court found that the "active risk of harm" to the children had not yet been "fully mitigated" by the parents.

The record shows that, with one exception not relevant in this appeal, the court proceeded to adopt the Agency's recommendations as to disposition provided in the December 17 report, which were tailored to "family maintenance for the two older children with the mother and for Michael [Jr.] with the mother and [father]."

Near the conclusion of the hearing, the court added, "As far as disposition—so this is my hope and this is where I believe [this case is] headed. So there is a lot that's culminated in each of these youth[s] throughout the course of their lives as far as exposure to violence and trauma

28

and what they have internalized, what they have seen.  But they definitely have the services in place, and only time will tell to see if that risk has been fully mitigated."  Because the court found that the risk of harm to the children could be "fully mitigated" "sooner rather than later," and given its view that this case was "headed [in] the right direction," the court set an "interim" hearing to "reassess legal options."

DISCUSSION

A.  *Section 300(b)(1)*

Jurisdiction under section 300(b)(1) requires, in relevant part, proof that the "child has suffered, or there is a substantial risk that the child will suffer, *serious physical harm or illness*, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . ." (Italics added.)

It is undisputed that at the time of the adjudication hearing, the children had suffered no physical harm or illness.  Thus, jurisdiction based on the allegations in the section 300(b)(1) petitions required that the juvenile court find by a preponderance of the evidence that there was a "substantial risk" that the children would suffer "serious physical harm or illness" in the future as a result of the parents' failure or inability to adequately supervise or protect them due to their domestic violence.  (§ 355, subd. (a) ["Proof by a preponderance of evidence must be adduced to support a finding that the minor is a person described by Section 300"].)

B.  *Physical Harm*

Mother and Father separately contend that the evidence is insufficient to support the court's jurisdictional findings under section 300(b)(1).  We agree.

29

1. Guiding Principles

In reviewing the sufficiency of the evidence on appeal, we consider the entire record to determine whether there is substantial evidence to support the court's findings. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393 (*Savannah M.*), disapproved on another ground as stated in *In re R.T.* (2017) 3 Cal.5th 622, 628 (*R.T.*).) We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence. Rather, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if other evidence supports a contrary finding. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52–53, disapproved on another ground as stated in *In re Caden C.* (2021) 11 Cal.5th 614, 635; *In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.)

Substantial evidence, however, is not synonymous with any evidence. (*Savannah M., supra,* 131 Cal.App.4th at p. 1393.) "A decision supported by a mere scintilla of evidence need not be affirmed on appeal." (*Ibid.*) Although substantial evidence may consist of inferences, those inferences must be products of logic and reason and must be based on the evidence. Inferences that are the result of mere speculation or conjecture cannot support a finding. The ultimate test is whether a reasonable trier of fact would make the challenged ruling considering the whole record. (*Id.* at pp. 1393–1394; accord *In re David M.* (2005) 134 Cal.App.4th 822, 828, disapproved on another ground as stated in *R.T., supra,* 3 Cal.5th at p. 628.)

"Physical violence between a child's parents may support the exercise of jurisdiction under subdivision (b) [of section 300] but only if there is evidence that the violence is ongoing or likely to continue and it directly harmed the child physically or placed the child at risk of physical harm." (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 717 (*Daisy*).) Further, "[e]vidence of past

conduct, without more, is insufficient to support a jurisdictional finding under section 300. There must be some reason beyond mere speculation to believe the alleged conduct will recur." (*In re James R.* (2009) 176 Cal.App.4th 129, 136 (*James R.*), disapproved on another ground as stated in *R.T.*, *supra*, 3 Cal.5th at p. 628; see *In re Rocco M.* (1991) 1 Cal.App.4th 814, 824 [noting that "[w]hile evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm"]; disapproved on another ground as stated in *R.T.*, at p. 628; *In re Yolanda L.* (2017) 7 Cal.App.5th 987, 993 [noting "[w]hen the jurisdictional allegations are based solely on risk to the child, that risk must be shown to exist at the time of the jurisdiction finding"].)

2. <u>Analysis</u>

The petitions in this case were filed under section 300(b)(1). The essence of that provision is that a child comes within the jurisdiction of the juvenile court if the child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness as a result of the parents' conduct. The record shows that the parties and the juvenile court agreed that the allegations in the section 300(b)(1) petitions primarily stem from what the juvenile court described as the "alleged violence" between the parents on October 20. We agree that the October 20 incident provides the primary basis for the Agency's petitions in this case.

We conclude that the evidence from this incident, and the violence that it allegedly involved, is insufficient to support a finding that, at the time of the contested jurisdiction/disposition hearing, the children were at "substantial risk" of suffering "serious physical harm" due to domestic violence. (§ 300(b)(1).)

31

First, the evidence is undisputed that, other than the October 20 confrontation and another possible incident sometime in the past, in which mother claimed father had "grabbed her arm" but had not hurt her, there was no history of physical violence between the parents. Indeed, mother specifically testified that the October 20 incident was the first time that father had injured her physically. Mother repeated this same statement during her myriad interviews with the Agency. And as noted, father denied that any physical violence occurred during the October 20 incident, claiming that mother injured her fingernail in a door as she was calling 911.

In any event, assuming that the court weighed the credibility of the parents' conflicting testimony regarding the October 20 incident and tacitly found mother's testimony more credible than father's, the record demonstrates that this incident involved minimal physical violence. The Agency itself recognized as much in its October 30 safety plan when it described the October 20 incident as follows: "It was reported that the parents engaged in a verbal altercation that esc[a]lated to *some physical contact (mom's nail broken)* while the children were in the home." (Italics added.)

Second, the record shows that all of the children reported to the Agency that they had never witnessed any physical confrontation between their parents. However, each of the children also reported that their parents frequently argued. But frequent arguing does not equate to physical violence between mother and father.

The parents rely on *Daisy*, *supra*, 192 Cal.App.4th at page 713 in arguing that there was insufficient evidence to support the court's jurisdictional findings under section 300(b)(1). In *Daisy*, the juvenile court found two children, ages 9 and 13, to be dependents based in part on the

32

father's commission of domestic violence against the mother. The domestic violence at issue in *Daisy* involved the father pulling the mother's hair and choking her. (*Id.* at p. 717.)

In reversing the jurisdictional finding, the *Daisy* court found that there had been only one incident of domestic violence between the parents, which had occurred years before the petitions were filed. (*Daisy*, *supra*, 192 Cal.App.4th at p. 717.) The *Daisy* court also found that neither child showed "any signs of physical abuse" when interviewed by a child welfare authority (*ibid.*); that the children "appeared healthy and well[-]groomed" (*ibid.*); that the children "denied ever witnessing [their] Father physically abuse [their] Mother and there was no evidence that the alleged hair-pulling and choking incidents occurred in the children's presence" (*ibid.*); that the "children stated that they had no fear of [their] Father" (*ibid.*); and that there was no evidence of any ongoing violence between the parents, who, in any event, had separated. (*Ibid.*) Given these facts, the *Daisy* court concluded that the evidence was insufficient to support a finding that "past or present domestic violence between the parents placed the children at a current substantial risk of physical harm." (*Ibid.*)

The Agency contends that *Daisy* is inapposite in the instant case because of the differences in the ages of the two children in that case (9 and 13) compared to Michael Jr. (5) and Tristan and Trinity (8) in the instant case, and the length of the interval between the domestic violence and the hearing; the domestic violence in *Daisy* occurred years before the petitions were filed and only about four months prior to the hearing in the instant case. Instead, the Agency relies primarily on the case of *In re R.C.* (2012) 210 Cal.App.4th 930 (*R.C.*).

In *R.C.*, the juvenile court found that three children, ages 3, 6, and 9, were at substantial risk of suffering serious physical injury based on two domestic violence incidents between their parents, one of which occurred in January 2012, about a week before the child welfare agency filed petitions on behalf of the children.  In that incident, the mother had asked a male friend to drive her to an appointment because she wanted to divorce the father. (*R.C.*, *supra*, 210 Cal.App.4th at p. 937.)   While the mother and her friend were driving home, the father called, said he knew that the mother was with another man, and threatened to kill her and her friend.  The mother checked on her two older children who were not at home, then returned home with her youngest daughter.  About five minutes later, the mother heard a knock on the front door.  Believing that it was her older children, the mother opened the door and the father " 'rushed into the house.' "  (*Ibid.*)

During this incident, the court found that the mother and the father had "engaged in a violent altercation" in front of the couple's youngest child, in which the father admitted to choking the mother.  (*R.C.*, *supra*, 210 Cal.App.4th at pp. 932.)  The court also found that the father had "slapped the mother's face with [his] hand" (*id.* at p. 933); "pushed the mother, causing [her] to strike [her] head against a wall" (*ibid.*); "repeatedly pulled [her] hair" and "grabbed and pulled [her] by the arm" when she attempted to go outside for help (*ibid.*); "pushed [her] into a couch" (*ibid.*); and, as he held her against her will, repeated his threat to "kill" her as she struggled to free herself. (*Ibid.*)

The court also found that, a few months before the January 2012 incident, while outside the family home, the father had become enraged after the mother asked him to take the children for the weekend.  The father believed that the mother "just wanted to go out" without him.  (*R.C.*, *supra*,

34

210 Cal.App.4th at p. 937.) In this earlier incident, the father "pushed the mother" against a car and "grabbed [her] by the chest, inflicting a mark to [her] chest." (*Ibid.*) Based on these two incidents of domestic violence, the court found that the children were as described in section 300(b)(1), ordered that they remain in the mother's custody but be removed from the father's custody, and provided the father with monitored visitation in a neutral setting. (*R.C.*, at p. 933.)

In affirming the court's jurisdictional finding, the *R.C.* court distinguished *Daisy* among other cases, finding that the evidence in its case involved "materially more aggravated facts" than in *Daisy*. (*R.C.*, *supra*, 210 Cal.App.4th at p. 944.) The *R.C.* court added, "This case does not involve a single act which endangers a child. Rather this case involves two separate acts of domestic violence; repeated threats to kill the mother; a threat to take the children to Mexico; domestic violence in the presence of one of the children; and one of the children, R.C., being afraid of the father. By contrast . . . *Daisy H.* involved either a two- or seven-year-old single act of domestic violence. None of the children in *Daisy* had witnessed the single act of domestic violence. According to the Court of Appeal in *Daisy*, the fact the parents were separated indicated there was no risk to the children. In this case, the parents were separated prior to the January 13, 2012 attack and threats to kill. Here, there is substantial evidence the parents' separation did not diminish the risk to the three children (as well as to the mother)." (*Ibid.*)

Both *Daisy* and *R.C.* inform our analysis in the instant case. Although there are factual differences between both cases and the instant case, we conclude that our case is more similar to *Daisy*.

Significantly for purposes of application of section 300(b)(1), in the instant case, as in *Daisy*, and in contract to *R.C.*, the children were neither

exposed to, nor witnessed, any physical violence between the parents. Moreover, unlike the children in *R.C.*, none of the children in the instant case feared either of the parents; Tristan and Trinity viewed father as a "father figure" and expressed a desire (through counsel) to be in his care, which mother conceded was important to the twins.

In addition, once the parents in the instant case separated and their divorce became final in mid-November 2020, the record shows that there were no other incidents between them, including any arguing. The facts in our case are thus much more like the facts of *Daisy* and dissimilar to the facts of *R.C.*, where the parents, despite their separation, engaged in additional incidents of domestic violence, ostensibly because of the father's jealousy. Finally, the domestic violence at issue in *R.C.* involved substantially more aggravated facts and violence than did the October 20 incident in the instant case.

We recognize that only four months had elapsed in the instant case between the October 20 incident and the contested hearing, in contrast to the years that had passed between the domestic violence and the time of the jurisdictional findings in *Daisy*. Nonetheless, like the parents in *Daisy* and unlike the parents in *R.C.*, there were no additional reports of domestic violence between mother and father after they separated. This fact takes on even more significance given that the parents in the instant case, while living separately, were able to exchange the children and co-parent almost daily without conflict.

Third, in making its jurisdictional findings, the court in this case relied on the existence of the July 9, 2020 restraining order issued ex parte by a Wyoming court. As summarized *ante*, the court used the July 9 temporary order as a "baseline" in evaluating the October 20 incident and the parents'

alleged history of domestic violence. However, there is no evidentiary support for a finding that the July 9 restraining order resulted from any physical violence between the parents, and the juvenile court did not make any such finding.

To the contrary, mother claimed that she sought the July 9 restraining order because father had spanked Trinity hard on the bottom after she stabbed her brother Tristan with a pen. And as noted *ante*, the court expressly refused to "speculate" regarding the reasons for the July 9 temporary order when it found that "[s]omething happened in Wyoming."

In addition, at the request of the Agency, on November 9, 2020, the Wyoming DFS provided a summary of its involvement with the family while they were living in Wyoming. There is no reference in the November 9 report to any domestic violence between the parents, nor is there any reference to any other incident involving the family leading up to mother obtaining the July 9 temporary restraining order against father.

Fourth, the record shows that once the parents separated and ultimately divorced, they were able to have "peaceful contact with one another" when exchanging the children and when co-parenting, which, as we have noted, occurred on an almost daily basis. The record also shows that both mother and father believed that their "relationship" had improved since their separation and divorce, and that the children shared this view. Their counsel at the contested hearing informed the court that the children were each "doing well in the care of their parents" and had no concerns to share with the court (other than a desire to return to Wyoming).

In light of the lack of any evidence of past physical violence between the parents and the relatively minor violence (i.e., a broken fingernail) stemming from the October 20 incident, together with the lack of any

37

evidence that the children were, at any time, physically harmed or at risk of serious physical harm resulting from violence between the parents, we conclude there is no basis to support a finding that, at the time of the contested hearing, the children were at "substantial risk" of suffering "serious physical harm or illness." (See § 300(b)(1); *Daisy*, *supra*, 192 Cal.App.4th at pp. 717–718 [concluding that "[n]either subdivisions (a) [n]or (b) [of section 300] provides for jurisdiction based on 'emotional harm,' " and that subdivision (c) of section 300, which is not at issue in the instant case, provides for jurisdiction if the child "is suffering or at the risk of suffering 'serious emotional damage' "].)

In reaching our decision, we recognize the struggles of this family in the years leading up to the October 20 incident, in particular those faced by mother as she admitted suffering from depression, anxiety, and PTSD. But neither mother's mental health issues (for which she should be commended for voluntarily seeking services), nor the parents' constant arguing, supports a jurisdictional finding under section 300(b)(1) based on domestic violence. (See *Daisy*, *supra*, 192 Cal.App.4th at pp. 717–718.)

In view of the limited extent of the violence that is alleged to have occurred on October 20 between the parents, the lack of any previous "physical violence" between the parents, as confirmed by the children, the lack of any evidence that the children were, at any time, physically harmed or at risk of physical harm resulting from violence between the parents, and the family's circumstances at the time of the February 19 contested hearing, when it was reported that the children had no concerns and were "doing great" in the separate care of their parents, we conclude that the evidence was insufficient to support the finding that "past or present domestic violence between the parents placed the children at a *current* substantial risk of

38

physical harm." (See *Daisy, supra*, 192 Cal.App.4th at p. 717, italics added; *James R., supra*, 176 Cal.App.4th at p. 136 [noting that evidence of past conduct alone is insufficient to support jurisdiction under section 300, as there "must be some reason beyond mere speculation to believe the alleged conduct will recur"].)

## DISPOSITION

The February 19, 2021 jurisdictional order is reversed.  On remand the court shall dismiss the November 20, 2020 petitions filed by Agency on behalf of Michael Jr., Tristan, and Trinity.[3]

AARON, J.

WE CONCUR:


McCONNELL, P. J.


GUERRERO, J.

---

[3]    In light of our decision, we decline to address other issues raised by the parties, including but not limited to, mother's claim that the court erred as a matter of law when it removed the children from the parents' custody and then placed them with both parents (conditioned on the parents living separately).